May it please the Court, Pat Zaharopoulos for the Warden. We appeal the District Court's granting of habeas in a life without parole double murder case based on cumulative error. The Court used three errors to reverse the conviction. The main one is the silence post-arrest pre-morandum. About four years ago, this Court determined that a police officer cannot even reaction of a defendant to the events of the arrest. Indeed, a majority of the circuits have held that post-arrest pre-morandum silence cannot be used in the case-in-chief. But this is collateral review on habeas. Consequently, the fact that the California Court found the defendant's silence in the circumstances of this case could be used is to be reviewed by this Court to see if it is contrary to or an unreasonable application of federal laws determined by the United States Supreme Court within the meaning of 2254D. And help me analytically. This one is a little tricky because it's an unreasonable application in that the California Court of Appeals unreasonably refused to extend the principle that the circuit courts of appeal have extended, which the Supreme Court has yet to opine upon. That's correct, Your Honor, and that's what makes this case so interesting. We contend that the And you might want to point out to your opponent, too, he fails to list the number of circuits that have decided in a different way. Did you see that in your, in his, as your view? Well, Your Honor, that is part of my argument because it's our contention that the California Court of Appeal, by refusing to extend Doyle, did not make an error because it was applying general principles of constitutional law where there is no United States Supreme Court authority. In other words, Valentine cannot point to a case, and he cannot even point to a clear, federally established principle that is involved here because this case lies somewhere between the Fifth Amendment right to silence and Miranda, Griffin, and Doyle. And there's no question the state was wrong under this court's ruling as to the use of the silence, but wrong is not enough, and Price tells us that. The case must be unreasonable within the meaning of ADEPA. And ADEPA does not It says federal law as determined by the United States Supreme Court. And as the judge just mentioned, the Supreme Court has not decided this issue yet. Must the Supreme Court, though, has spoken on the exact issue presented in the case for this court to conclude that a state's application of clearly Your Honor, it does not have to speak directly, but there has to be a clear constitutional principle that the court has misapplied. In other words, we are asking this court to rule that no federal court on habeas review should grant relief and overrule the state's holding if any reasonable jurist could objectively reach the same result. And in this case, there are three reasons why we believe the state's post-arrest pre-Miranda silence ruling is not unreasonable. First, all relevant evidence is admissible, absent statutory or constitutional prohibition. Second, silence is ambiguous. There's no clear Supreme Court ruling on it, and both sides have valid arguments. So our position is that when both sides have valid arguments, until the Supreme Court decides the issue, the states are free to make any reasonable decision within the general principles of constitutional law. Now, applying those general principles are used. But doesn't Williams v. Tayers say that a state's application may be unreasonable, and if the state court unreasonably refuses to extend the principle to a new context, where it should apply? Why doesn't that? That is correct, Your Honor, but there is no clear principle in this case in that some of the have used Griffin, some have used Doyle, and there is not a clear answer to this question. Furthermore, there are enough states and circuits that have decided in conformity with the California ruling that we cannot find that it's objectively unreasonable. Perhaps Congress wanted Supreme Court authority so that one circuit would not be ruling that the decisions of another circuit are unreasonable, or to limit the states being bound by federal law only to core law rather than other reasonable courts that have agreed with the California Supreme Court in that the Fourth, Eighth, and Eleventh Circuit and the states of Michigan have also come to the same conclusion. I wanted to touch briefly on the other two issues raised, and that is the district court found that cross-examination had been limited as to Detective Dawson, and that business records exception denied cross-examination of the DNA technician who actually conducted the DNA test in this case. As to the detective's we contend that at most this is an improper exclusion of defense evidence, and such evidence must be central to the defense to be reversible error. We note also that in the Well, how much of the state's case was based on the jury's assessment of the credibility of the officer and Valens? It was, Your Honor, but there were two detectives that heard the confession and both testified virtually to the same scenario and the same confession. But we contend that any limitation on cross-examination was insignificant for two reasons. First of all, the jury knew that the detective had gone to the jail with a tape recorder and had tape recorded a conversation. What the defendant wanted to do, however, is get before the jury that he asked questions in order to indicate that he had not meticulously followed the rule of not questioning a defendant who has invoked his right to an attorney. But there were two issues surrounding that, right? One had to do with whether there was a five-minute pause in the recording and whether the detective could be allowed to be cross-examined on what was said that wasn't on the tape? That's correct, Your Honor. There were two aspects of it. One was what was said that was on the tape. Were there questions asked that would make the detective look incredible as to his statement that there were no questions asked when the confession was made spontaneously? The tape was not played. And then the second one was the five-minute gap. As to the five-minute gap, it's our contention that that was waived, and I don't think that the defendant is pursuing that. But what he is pursuing is the fact that he was questioned. And it is our contention, first of all, that the jury knew that the officer went and that the officer taped, but also that another detective heard the confession so that the cross-examination of this person as to what questions he asked becomes less significant. But the ADA at the time offered a hearsay objection, and the Supreme Court judge sustained that objection. Do you concede that it wasn't hearsay because that's not what it was being offered for? It wasn't being offered for that purpose, Your Honor, but her hearsay objection is interesting because she felt that what the defense was really trying to do was to get the defendant's denials into evidence. Well, because I understand what Mr. Iredale was trying to do. He was trying to show that this detective was pushing so hard in order to evade this man's Fifth and Sixth Amendment rights that he was making up what he had said earlier in the unmarked car en route to the jail. That was the purpose for trying to cross him on his motive. Yes, and that was the district court's impression as well, Your Honor. And do you think that's a reasonable, based on the record, is it reasonable for us to conclude? It's a possibility just as much as the other. Well, it was a cross-examination. The question is, did the constitutional violation amount to the decision? And our contention is it was not that significant, both because another detective testified as to the confession and also because the jury knew that there had been such a conversation and it had been tape recorded. And furthermore, Your Honor, the questions asked seem far attenuated, both from confrontation and credibility. What he asked was, do you remember, not did you kill the person, not did you do such and such or did you fail to do such and such, but do you remember? And it's our contention that it's just as reasonable that this detective is so blown away by the conduct and the spontaneous admission. He was trying to get on tape what he wasn't able to get on tape. To get on tape the first time. The tape recorder was locked in the trunk with his gun. That's the possibility. That's our contention. And this is an improper exclusion of defense evidence and it's rather than a denial of cross-examination. The DNA case, frankly, I think the district court was flat wrong on this one because it's routine. The DNA evidence and blood evidence comes in through an expert who uses business records. Furthermore, it's not a constitutional issue. The only Supreme Court case cited is Palmer v. Hoffman and that in turn discusses an Ohio case. Both of those cases are decided on statutory grounds as rules of evidence regarding federal statutes. In other words, the U.S. Supreme Court is not going to decide for all states, for all reasons, what constitutes a business record. They did not find that business records were constitutionally mandated. They were, it was interpretations of statutes. Finally, I'd like to say that on the cumulative error issue, that is a little difficult because there's not a single error of equality to be reversible by definition. So the question is, do we have to knock out one or two of the three reasons to get this court to reverse? I believe that even combined, these are harmless errors because the defendant had motive, opportunity, and three hours of furtive behavior at the house when police arrived before his arrest. And there are six reasons why it did not affect the jury. One, the confession was heard by two detectives and corroborated incidentally by the overlays that indicated that the wound on the mother's cheek was made by a specific brand of 14-inch wrench. Second, the blood evidence was very strong. Third, the jury instruction is interesting because it tells the jury if an ordinary prudent person would challenge, deny, or inquire, then they may consider the defendant's silence. And as we've argued before, we feel that that was a reasonable decision based on the fact that the Fourth, Eighth, Eleventh, and Michigan have reached the same result. And fourth, this would be admissible evidence under Doyle. So we would argue that it was cured by the defendant's testifying. Once the defendant testifies, there are cases that say that the prosecutor can ask questions about his post-arrest silence pre-Miranda. You didn't know that at the time the evidence was introduced. The problem with introducing it is that you don't know if he's going to take the stand or not. So then, fifth, the confrontation issue can be seen as an evidence issue. And a second detective heard the confession. And finally, business records is not constitutionally mandated. So on that basis, we would contend that even if all three of these errors are upheld, that it should still not be reversed for lack of prejudice. Thank you very much. Mr. Aredale. Good morning to your honors. In this case, first the magistrate judge, now Judge Burns, and then the district court judge, Judge Jones, carefully considered a very large record and a complicated case. Well, both judges are very fine judges. The problem, though, is AEDPA. And what do we do with the fact that this is an unusual twist? We don't see very many claims that, I don't mean to speak for my more experienced colleagues, but in my time on the bench, I think this may be the first case I've seen where there's a challenge to the refusal by the state court to extend a principle into an area where the Supreme Court has yet to opine, but the circuit courts seem to be sort of mounting up on both sides on the issue. Judge Tolman, let me address that in this way. First of all, although we argued in response that the claim that an extension of Supreme Court law to a new area is not improper, which they seem to suggest, even though the language of Williams that you cited, Judge Nelson, says exactly that, that the refusal to extend a clear principle to an area where it should be is a violation of... I didn't hear her say that. What I heard her say was because it's an extension, there has to be some great deference paid to the state's refusal to boldly go where the Supreme Court has yet to go. That is my point. The Supreme Court has gone there. They've been there 40 years ago. We've got Miranda, we've got Griffin, and we've got Doyle, and you certainly can't be arguing that there's a case right on point that lies there. I'm sorry. No, go ahead. Miranda says that at bottom, no use can be made by the State if the defendant stands mute in the face of an accusation. That language we quoted from Miranda, and we cited it several times in the brief. And that is a very clear, and to my mind, explicit... Where in Miranda do you find that? May I have just one moment? Yeah, absolutely. We cite it on pages 34 and 35 of our brief. This is the language. But that's after he's in custody when the obligation to provide the litany has been triggered, and that once he's told you have the right to remain silent and nothing you say can be used against you, the State has given an expressed promise. And isn't that what the Supreme Court's talking about? No, that is the issue in Doyle. And actually, let me take a step back and make a distinction between two uses of silence, one of which is clearly permissible, and the other of which the vast majority of cases, and clearly the reasonably decided cases. The Ninth Circuit rule. No, the Ninth Circuit and eight other circuits. There are three circuits that have gone another way. The Eighth Circuit most recently, in 2005. You are ahead of me in the research. The only case cited by the State was the Rivera case from the Eleventh Circuit, which has one sentence in it and is hardly a reasoned opinion. We're going to decide the case, and so you don't have to worry. But if you want to look, United States v. Frazier, 408 3rd, 1102, Eighth Circuit, 2005. Thank you so much, Judge Ferris. And may I apologize? I should be doing my own research. Don't worry. We're going to decide the case on the principle that you recognize has been established. And a very important principle it is. Let me just go to this, Judge Thomas. I mean, as far as I'm concerned, your case sort of stands or falls on this aspect, this issue on it's that that narrow. I don't know the word I'm looking for, but it's it's it's the question of pre Miranda post arrest response or lack thereof to the events surrounding the arrest, which may not even involve interrogation. It may simply, as in this case, be you are under arrest for murder and the jury is asked to draw some kind of an inference from the fact that the defendant did or said something or nothing in response to that. Let me draw this distinction. We have three periods of time before arrest and before confrontation with official authority. Statements or silence is admissible. Clearly, an utterance or a statement by a defendant is always admissible or and silence in response to an accusation. And it's so-called adoptive admission is admissible. After Miranda, silence is not admissible at all. That's all granted that that's now in between that we have Fletcher versus Weir, which says that for that period of time after custody. And by the way, Judge Tolman, he was clearly in custody for Miranda purposes before he was told you're under arrest for murder. He had been handcuffed, put in the police car, had been there for five or 10 minutes before Donaldson came up and said that you litigated that on a three five hearing or whatever you call 1538.5 hearing. Yes. And I'm just representing what the facts are. In other words, he was in custody but had not been given Miranda Fletcher versus Weir says Supreme Court law says in such a case. If a defendant goes to trial and testifies and says something that is contrary to the silence. Oh, yeah. I was just getting ready to tell you guys the robber ran that way or. Oh, what I forgot to tell you is, you know, just before I got in the car, this is this other guy came in and tossed that in the back. I didn't know what it was. Then the state is permitted to say just one second before you were given your rights. You didn't proffer this explanation, which clearly should have been proffered in light of your trial testimony. And in that case, the silence post arrest pre Miranda is permitted for one limited purpose to impeach the defendant's story. It is not in any event under Fletcher versus Weir or under any other Supreme Court case permitted as a substantive proof of guilt. But it's not prohibited. That's the problem that we have here is that the Supreme Court has yet to extend those principles to use during the case. Well, let me frame it this way. In Miranda, I believe, and in Griffin, the general rule is silence in the face of an accusation may not be used. And Fletcher versus Weir represents the Supreme Court's footnote and limitation or modification of that rule so that a mendacious defendant may not exploit it unfairly. Same rational hypothetical footnote from an opinion yet to be written. No, no, no, no. What I'm saying is when the Supreme Court decided Fletcher versus where they were deciding against the background, silence may not be used. We believe that language in Miranda is very clear and Griffin is very clear. Silence in the face of official accusation may not be used. It is like after Doyle, especially in the culture in which everybody or most everybody who watches TV knows you have a right to remain silent. A policeman arrests you and accuses you and you're silent. Now, does that mean I'm silent because I'm guilty and I'm not going to tell you anything? I'm silent because a reasonable person would answer, but I'm not going to. Or does that mean the person is watched law and order and CSI one, two and three? Because all as the Supreme Court and Dickerson pointed out, Miranda is now part of the culture and the principle of your argument is a little broader than that. It is that the Fifth Amendment privilege against self-incrimination is self-affectuating in the sense that the fact that the defendant said nothing simply cannot be used against him. That's the principle. It happens to be embodied in a specific warning. But the constitutional amendment stands to protect him notwithstanding. Yes. And we have cited the Moore case from the District of Columbia decided many, many years ago, the Seventh Circuit case of Savory. And they all say that the State's argument that we can use silence not to impeach a mendacious story of trial, but silence in and of itself substantively in the case in chief with a jury instruction that says you can consider the silence as proof of the truth of the accusation. Help me with this. What turns the Constitution on its head? What did Congress intend when it enacted AEDPA and provided the restriction that it is the pronouncements of the Supreme Court that control the State courts and the federal courts in reviewing state court convictions on habeas, not what other states or other federal circuit courts of appeal have to say on this? Well, I think they are saying what the Supreme Court said itself that we've just discussed, which is the principle must be fairly derived from existing Supreme Court precedent. And I think it is fair to say that federal Supreme Court jurisprudence from the last 50 years and certainly after Miranda and certainly after Griffin versus California says that it is constitutionally impermissible when a defendant is silent in the face of an accusation, whether it is an accusation at trial hurled by a prosecution before a jury, whether it is an accusation hurled by a policeman after Miranda, or I say clearly under the principle itself. But if the defendant takes a stand, it can be used against him, but for impeachment only. Exactly. And the jury is instructed, you may consider his silence for the purpose of determining the truthfulness or lack of it of the testimony he gave. Whereas in this case, they went even beyond that. In other words, the state's argument is, well, he took the stand and it could have come up then anyway. Not true, because they gave an adoptive admission instruction which said, in essence, you may consider the fact that he didn't speak when he was told you're under arrest for murder. So we should declare that instruction constitutionally impermissible as a matter of Federal constitutional law? No. I'm not asking you to take that. Well, you're challenging the instruction that went beyond what the proper limiting instruction that should have been given. It told the jury that it could draw an adverse inference of substantive guilt, right? Yes. Absolutely. It has to be wrong. The instruction as applied in this case is wrong. Normally, it refers to a much broader area of evidence where somebody is walking on the street, they say, did you do that? Did you do this? And the person is silent and walks away. I don't want to use up all your time on the Fifth Amendment issue. Could you help me with the business record issue? Because as I understand what our respected trial judges did, they have essentially announced a new principle that no laboratory examination report can ever be an admissible business record for purposes of criminal trials without the testimony of the actual technician who conducted the report. Judge Tolman, you strike me to the heart with the phrasing of that question. Well, I try to ask insightful questions. You did. If you can give me an insightful answer, I'll be most grateful and then we can all go home. All right. OK. The answer to that is absolutely not. The decisions in the court below said that when you are dealing with DNA evidence of a highly complex nature in which the reliability of the test is critically tied to what steps are done in the testing process and cross examination as to the method and the steps that are taken, any of which step, if missed, would result in an unreliable result. Different from a DEA or narcotics laboratory technician conducting a gas chromatograph evaluation of suspected narcotics. That involves multiple steps with fairly sophisticated equipment, which really mean DNA evaluation may involve a few more steps, but it's it's pretty complicated stuff. Well, the answer to your question is generally the chemist who does the test is required to testify in federal courts. But those laboratory reports with or without the admission, as long as somebody can lay a proper evidentiary foundation under under 801. What is it? The exception. I don't want to quarrel with you as to this or as to the general issue. But let me just say, in this case, there were not only issues concerning who did the test and how it was done, but there were ambiguous results that could be interpreted as stutter bands, so-called light bands. Was there a supervisor with a Ph.D. who certainly had the expertise to cross examine in order to establish that to the jury to question the reliability of the results reflected in the test report? No, Judge Tallman, when we need to know whether in step number three, whether the technician did this or that, which could have resulted in these stutter bands. And the person that they called said, I have no idea. I didn't watch it. I didn't even do the immediate supervision. That was done by a second person. I'm the third level. And I am testifying to you about the test that was done by my company, which is a for profit company. And I'm I'm reading from the results that this third person got. So the best you can do is to elicit from her an admission on cross examination that if it isn't done right, then you then these stutter bands can have can be an indication that the testing was contaminated. Absolutely. Followed by her statement. But I'm sure they did it right. I'm sure she did it right because we're a very good lab. What do we do with the fact that I assume you had the test results in advance of the trial? You could have subpoenaed the the lab technician to put him on as an adverse witness and ask her the questions that you say you were precluded from asking because of the manner in which this evidence. There is no requirement in constitutional or any place else for the defendant has to subpoena a witness that the other side has and should have called against him to prove their case. But your attack really is to the is to the weight to be given the evidence or it's an attack on the admissibility attack. But I understand the rule that are to the magistrate and the district judge articulated. This is a declaration that the test results themselves are not properly admissible under a recognized exception to the hearsay. That's exactly right. And under recognized Supreme Court law, Ohio versus Roberts, which says that for evidence to be admissible against a Sixth Amendment objection, there has to be a showing of two things. One, unreliability and two, unavailability. I'm sorry. Unavailability in the first instance and reliability in the second. Why wasn't that test satisfied by having the supervisor from the lab and I guess it was the blood technician who was also involved in the gathering of this evidence from the San Diego Police Department available and cross examined by you on all these issues? Because the results of the test were determined. The initial report was written and the test itself was conducted by a person. And it is that person's credibility, actions and conclusions which are being admitted into this trial. And it's that person's credibility which cannot be confronted. It again goes to the weight to be given because as long as the item of evidence can be introduced and a proper foundation laid for it under the existing exception to the hearsay rule, it comes in as evidence. Not if there are Sixth Amendment concerns. Not if it is critical evidence and not if the reliability of the evidence is contingent upon the skill, the statements and the findings of a person who is available should the other side choose to call him. Otherwise, for instance, in a murder case, they could say I got the pathologist report. And who am I?  I'm going to read you this report. Well, in this where you say the cause of death is such and such. Let me ask you. Did he consider X, Y and Z? Well, I'm reading you his report. Now, you say quite properly. Well, counsel, didn't you have the expert of experts, the PhD when what is done is not so grand as what is the theory of DNA? But did you take this little bit of substance and put it in the tray in the right order at the right time? Were you wearing gloves? And what was the sequence? We did not. We did not. So that was the only DNA evidence. And as the opinions in the court below, that was the critical DNA evidence. And let me just go to this, which is if this is true, if their position is right, then they can evade cross examination of any expert finding by saying it's a business record. When we look at the record, though, we see the basis of the cross examination. And the accused, he was at that time the accused, had rational basis for why his father's DNA or his DNA might have been in these places. There was the challenge that you made successfully to the judge, at least successful to this point. That that was not the basis of the of the trial record as I as I have reviewed it. Now, tell me whether I'm wrong. Judge Ferris, I tried the case a long time ago, so you'll forgive me if nine years has dimmed my recollection. But the problem is and the reason why it was so important that one of the results, not of Miss Peer, who was the one from San Diego who did the test for the police department, but of the lab, the cellmark lab showed that there was a slight admixture of what was probably the mother's blood with the father's blood and Alex's DNA. That that was the critical piece of evidence. And that had to do with these stutter bands. Maybe I don't remember correctly, but there was a substantial height difference between the father and the son. Is that isn't that what the record between six, one and five and the DNA of the of the of the father was found on the son's genes. And the son had an explanation for that. Yes, my father rolls up my jeans and sometimes wears them around the house. Yes. You are doing little jobs. Yes. That's what the record shows. Yes, sir. Absolutely. Now, if the record shows that. But his his basis was not that at all. His basis was what you're saying now. I don't know. Why would he make all. Why would he have all these explanations for why he's not complaining that it's not his DNA. He's saying it is. But here is how it happened to be there. Isn't that the way the trial played out? Yes. Judge Ferris. But the reason why there is prejudice isn't the way the appeal played out. When you came into court, you convinced somebody that the problem was a supervisor. No. The problem is that that is the way it played out. But it relied upon an attack on the cellmark records, not the peer records, but the cellmark records, because one of those results was inconsistent with the defendant's testimony. And that is why the admission of that DNA evidence. And with the prosecution's theory that he'd murdered both the mother and father. And that's why the admixture of the mother and the father's blood was found on the jeans. Exactly right. And that's why it was so critical that we determine was this result. And you'll see we put I believe on page 18 of our brief. We showed you the bold result shows what was a clear result. And the others are what were called stutter bands, which are faint bands. And they may be an artifact of the testing or they may be evidence of the presence, the faint presence of a blood of another person. Now, they said on one of these stutter bands, that's evidence of an admixture. And the reason why is critical is we needed to see in doing this. What did the technician do that could result in a stutter band? Is it, in fact, a stutter band, an artifact or is it a faint trace? And what happened is the expert would say when it was to the prosecution's benefit. Oh, it's just a faint trace. And when it was not, when the light band would say it was another person, she said, oh, that's an artifact. The technician before trial to find out what she did with regard to these tests. Judge Tolman, this is the whore of the record. And I'm going to try to answer according to my recollection. I think I called her and she said to me, you have the report from Selmark. So you just read that. So don't bother me anymore. No, I mean, she was very professional. I don't mean to suggest that she was improper in her behavior toward me and she had the right not to be interviewed. But that's that's what it was. And to tell you the truth, I think that the person that I talked to was the technician. And for whatever reason, the prosecution called the assistant director of the lab. And let me just point this out. I want to say one final thing, because I think I'm way over. But I mean, it's an important case. So go ahead. If you'll permit me. The critical is you're not going to get to rebut her. Yeah. Might as well make your points now. Thank you, Judge. I'm telling you, you've got a third of the court that's a little dubious about your position. Judge Ferris, I hope it's limited to a third. And I can hope I can touch your dubiety just a little bit with this. I this same lab changed its name slightly. And recently, according to an article that I submitted to the court. Now, the record is closed and I submitted for what it's worth. And if you tell me it's the whole of the record, shut up. I will do that. But this same lab just caught a lab technician who had phonied up, dummied up the results in nine cases here for the Superior Court of Los Angeles that they had to throw out the convictions. And my point in that regard is this, where it is the work and the credibility of the person who does the test, which is really what is being introduced into evidence. The Sixth Amendment Crawford aside, the law at the time, Ohio versus Roberts to admit critical evidence. They have to, without calling the person whose credibility and statements at issue. We say that we are basically telling every state and federal criminal court in the jurisdiction of the Ninth Circuit. You cannot rely on laboratory test results in any criminal case without the technician who actually performed the test appearing as a witness at trial. Judge Coleman, let me just say that I do not ask for so grand a principle. I don't see how we can write this position without that principle carrying the day because it has to be a constitutional principle. Let me write it for you. It says that in a critical case where scientific evidence and the testing technique of the scientific evidence is critical to the reliability of the evidence and that evidence itself is critical to the result. Then a report of a second or third person or the testimony of a fourth person about the actions and the results determined by a technician which were not witnessed nor participated in at all is no good. It is it is not as far. I'm not positing of that blanket rule, but I will tell you, I think you just articulated. I mean, I don't see how any rational lawyer could hear the rule you just articulated and not conclude that in every case you have to call the person who conducted the test. Not only that, you'd have to take another step. You can know in advance what the report will say and you can have all the questions you want about the report and you are not obligated. And of course you're not because the state must prove its case beyond a reasonable doubt. So you're not obligated to rebut it. But if you elect not to rebut it and you have the business record when there was an opportunity and there certainly was an opportunity to call a rebuttal witness and none would call. When do we ever get finality? And I gather that we don't, in your view. Just because I don't mean to sound outrageous in saying this, but under the discovery rules of nearly every state and the federal government, you're entitled to all of that. You're entitled to the report in advance. You're entitled to to know these things. I'm suggesting you've got it and you know, you're going to question it. Yes, sir. Well, in that regard, what happened in this trial is we didn't have that advance notice. You're suggesting we were told that the lady who did the test was coming. And then at the last minute, a day or two before. I'm not saying it's an okie doke they pulled on us, but they said, oh, no, she's not coming. This one is coming. But this was a two month trial. I mean, you still had it. You're not suggesting to us that you didn't have time to issue a mid trial subpoena to call her as a witness in the defense case in chief so that you could cross examine. There's so much with respect to that. And this is the final thing. I apologize. Recently, this is a very important case because the young man's life is going to turn on what we decide in all probability for sure. Let me just say this. First of all, there's no obligation on us. I don't mean to be hyper technical, but why do I have to call there with you? You don't. You don't. And you didn't have to. But when we look at the record and we see was an allegation made that this is not a proper expert. Was you know what we see is a record where you explain why what was found was found. And that's what we have in this record. Yes. And that's all we have in this record. Isn't that correct? No, sir. What you also have is a refutation of what the defense was by a result that was proffered by a hearsay witness who was testifying about what your client knew before he took the witness stand. Because this came in in the prosecution's case in chief that this evidence stood there that he was going to have to meet. Of course. So he wasn't surprised by it when he got on the stand to testify in his defense. He knew that the prosecution had established through the testimony of these witnesses the suggestion that there was an admixture there, which was consistent with the prosecution's theory that when he drove home after the murders, he was covered in the blood of both victims. That's or that he had it in some way. And that's how it ended up on the steering wheel. And so on. That's exactly right. Judge Tolman. And I argued and I debated and I suggested that it was an invalid result because it was a so-called stutter ban and that you can't rely on it and that they didn't put on the evidence. But in the lack of proper cross-examination of the person who really did the test. And in other words, the woman they called was great. I freely concede to you. She beat me up on the cross-examination. I had no idea what you wanted to do and why you couldn't do it with the witnesses they called. And when it is that when it is not the credibility of their expert, but the issue of did the test get performed properly? Was there contamination? Was there the proper adherence to a very complex protocol and DNA testing? Require a fry hearing, in essence, in every case where DNA or. Drug laboratory or blood analysis by a hospital lab to show alcohol or drugs in the blood was going to be introduced in the case. Absolutely not, Judge Tolman. Once the subject matter has been determined to be appropriate under Fry or in the federal court under Daubert, then there need not be any other fry hearing. It's just that when the particular results are being proffered, the person who got the results, who did the test. And by the way, the focus of the question seems to be that this is just a bizarre thing that I'm suggesting. In fact, in almost every case I've been involved in, the practice is that they call the person who did the test. They do that. You shouldn't assume from our question that we think it's a bizarre argument. We understand your argument. And unless the court has anything further, I think we've let you run over here about an extra twelve and a half minutes. And I'm going to let the D.A.G. have the final word. You have. And I thank you very much. It's a very helpful argument. How did the father's blood get in the drain of the defendant's shower on his clothing and on the steering wheel of his truck? That was the issue at trial, not whose blood was it. Furthermore, the expert testified in this case that if proper protocol and cleanliness is not used, you may get no DNA result, but you do not get the wrong DNA result. The lab is for profit, as the defense has said, but I'm not sure it knows who's who in this situation when they have three samples to run. And the lab exonerates as well as incriminates. So I would argue that the blood was run not for litigation so much as for investigation as far as the lab is concerned. I was trying to figure out how we could write the opinion in the way that Mr. Iredale wants it. And the analogy that came to my mind was, what do we do with a for-profit hospital that routinely analyzes blood and other bodily fluids for all sorts of things? They charge the patients for it, and there may come a time in a criminal case when what that blood contained would be the subject of evidence a prosecutor would introduce in the case in chief. Was the defendant drunk? Was he under the influence of narcotics at the time? And if the defendant had been admitted to the hospital on the night of the crime, that may become an issue. Does that mean that we can't trust a for-profit hospital laboratory because its laboratory reports can't be admissible as business records? Your Honor, that's my point exactly, is that the lab really does not know or care who or what samples it has. The job of the lab is to match or exclude, so it exonerates as well as inculpates. And the lab has no dog in this fight is the bottom line. They may be for-profit, but they do not have a position in this case. So we would contend, therefore, that in a situation where you can't get a wrong result, you can get an absence of a result, and the business record can be used. And we can speculate as to why the DA did not call the actual lab tech, but I don't think it's that highly relevant. Going back to you're under arrest for murder. There may be a lesson to be learned from this case, though, and we are teaching lessons, and you will have to decide whether there is or not. But go ahead with your argument. Thank you, Your Honor. You're under arrest for murder. The defendant didn't ask who died or are his parents okay, and it didn't take a rocket scientist to see that that was going to be the defense, because as you remember from the facts of this case, the mother and father were killed sometime after 4.30 p.m. and before midnight on the 2nd of August. The body was found 9 a.m. on the 3rd, and the cops were at the family home at 2 a.m., with the arrest happening at 3 a.m. The defendant chit-chatted a lot with the transporting officer, and during the course of events, kept saying he didn't know what was going on. You may not want to go beyond rebuttal in this time, because he's not going to get to rebut what you are now arguing. Are you answering an argument he made? Your Honor, basically, that's a good point. Thank you. Our argument is that Miranda talks about not using the silence of the person. Justice Scalia tells us that this is dicta in Miranda, but more important, this is referring to silence after an invocation. Griffin tells us that the prosecutor cannot comment on the defendant's failure to testify in court, and Doyle tells us it can be used for impeachment if he does take the stand. There's no question in this case that the state made a decision contrary to the Ninth Circuit's view of this issue, and to the majority view of this issue. So when does circuit law become binding on the states? Well, according to Adipa, never. Only when it's unreasonable. The district court said, well, it's 8-1, so it must be unreasonable. First of all, to quibble about a little thing, it's 7-1 because the 7th assumed without deciding that silence couldn't be used. But even if we say it's 8-1, I don't think this Court or anyone else can assume that one circuit of the United States Court of Appeals is unreasonable. You may conclude that they're wrong. But you're not suggesting that because of the fact that reasonable judges might differ over an issue, that we still couldn't declare that a principle was so clearly established that it should have been extended to this situation, are you? I'm not, Your Honor. And that was my point when I said there's no case, Supreme Court case on issue, and there's no clearly established principle on issue. The answer lies somewhere between the Fifth Amendment and these three cases. And it's not so clear that we can say that the California decision was unreasonable. Okay. I think we – unless you have something else, I think we have it. I think we have it, Your Honor. The circuit courts may show a direction or a trend, but they're not binding. And our position remains that unless and until the Supreme Court decides this issue, the states are free to make any reasonable conclusion that they feel is appropriate to the circumstances of the case. All right. Thank you very much. Thank you both. The argument was very helpful. The case just argued is submitted, and we'll puzzle our way through it as quickly as we can. Let me just inquire with regard to the first case on the calendar that we skipped over this morning. Is there anyone here on Alvarez-Acives v. Fasano? Yeah. Okay. And you're Mr. Evans? I'm Mr. Myers. Mr. Myers. Oh, I'm – so you flew all – or you came from Irvine, and we, for some reason, Mr. Evans, will hear argument from you. If the government hasn't shown, then they'll – Did anyone call opposing counsel? I wonder if – I did, Your Honor. I only have answers. Thank you. All right. Well, if you – Too bad you had to sit through it all, but some of it might have been interesting to you. That's correct, Judge Ferris. There was some argument that's relevant in this case. If it pleases the Court, there are three independent reasons why my client should receive relief from deportation in this case. The first is that the government failed to prove by clear, convincing and unequivocal evidence that Mr. Alvarez was convicted of a firearms offense. The second was that Mr. Alvarez did not receive the effective assistance of counsel and was, therefore, deprived of parole.
judges: Farris, D.W. Nelson, Tallman